UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL G. SMITH,

                              Plaintiff,                    MEMORANDUM OPINION
                                                           AND ORDER

              -v-

TUCKAHOE UNION FREE SCHOOL                                 03 Civ. 7951 (PGG)
DISTRICT, and MICHAEL YAZURLO,
Superintendent of Schools, Tuckahoe
Union Free School District,

                              Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

 Tuckahoe Union Free School District – at the recommendation of

Superintendent of Schools Michael Yazurlo – hired Carl G. Smith as its Director of

Finance in August 2001, and four months later – again at Yazurlo's recommendation –

fired him.  (Def. R. 56.1 Statement ¶¶ 38, 41; Yazurlo Aff. ¶ 3)  Smith claims that

Yazurlo's recommendation that he be fired stemmed from Yazurlo's racial animus and

desire to retaliate against Smith for complaining about Yazurlo's sexual harassment of

another African-American School District employee.  Defendants contend, however, that

Smith was fired for poor job performance.

 Defendants have moved for summary judgment as to all of Plaintiff's

claims.  Because there are disputed issues of material fact regarding the reasons for

Smith's termination and the events that led up to it, Defendants' motion as to Smith's

Title VII wrongful discharge and retaliation claims will be denied.  Defendants are

entitled to summary judgment concerning Smith's parallel state law claims, however,

because they are time-barred.

# I.   BACKGROUND

## A.   The School District Hires Smith

During the summer of 2001, Smith submitted a job application to the School District for the position of Director of Finance.  (Def. Ex. O)  After an initial screening, Smith was interviewed by Superintendent Yazurlo and Assistant Superintendent for Personnel and Curriculum Barbarann Tantillo.  (Def. R. 56.1 ¶¶ 19, 47, 54[1]; Yazurlo Aff. ¶¶ 1, 5; Tantillo Aff. ¶ 1)  Yazurlo and Tantillo selected Smith and a white applicant for a final interview round with the Board of Education.  (Id. ¶¶ 60, 61)

After these interviews, Yazurlo and Tantillo met with the Board to discuss the two finalists.  The Board asked Yazurlo – who had daily contact with the Finance Director – for his recommendation, and Yazurlo recommended that Smith be hired.  (Id. ¶¶ 62, 65-66)  The Board accepted Yazurlo's recommendation and hired Smith as a probationary Director of Finance.[2]  (Id. ¶¶ 67, 68)  Smith began work for the School District in August 2001. (Yazurlo Aff. ¶ 3; Def. Ex. U at 35:12)

---

[1] Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted, are deemed admitted – because they were neither admitted nor denied by the opposing party – or have not been contradicted by citations to admissible evidence.  See Gianullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citation omitted).

[2] Smith alleges that Board member Rev. Frank E. Coleman, Jr. told him that the Board wanted to hire a Caucasian.  (Pltf. R. 56.1 Stat. ¶ 66)  This statement is hearsay, however, and the Court cannot rely on it in ruling on Defendants' summary judgment motion.  See Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (a district court ruling on a summary judgment motion "may rely only on admissible evidence").

B.    **Evidence Concerning Smith's Job Performance**

Defendants claim that, from the outset, Smith was incapable of performing the duties and responsibilities of the finance director.  For example, Defendants have offered evidence that Smith

> failed to prepare a fixed asset inventory, a simplified budget report, and an accurate budget calendar, and was unable to answer simple questions about the School District's budget (Def. R. 56.1 Stat. ¶¶ 69-70, 72, 83);
>
> prepared an inaccurate comparison of the cost of health insurance coverage offered by competing carriers (id. ¶ 71);
>
> represented – incorrectly – that no state aid was available for a School District construction project (id. ¶ 73);
>
> failed to obtain required training for a School District clerk (id. ¶ 75);
>
> contacted the School District's legal counsel without Yazurlo's approval and in violation of School District policy (id. ¶ 76);
>
> pretended to be sick to avoid giving a budget presentation (id. ¶ 77);
>
> had serious disputes with several co-workers and was the subject of a sexual harassment complaint (id. ¶ 78);
>
> fired a secretary without authorization (id. ¶ 79);
>
> reduced a co-worker, Joanna Scrivo, to tears (id. ¶ 80);
>
> improperly intercepted a telephone call from Board President Reich to Yazurlo and complained to Reich about Yazurlo, thereby violating the chain of command outlined in School District policy (id. ¶¶ 81-82); and
>
> caused Assistant Superintendent Tantillo to repeatedly express concerns to Yazurlo that he was incompetent.  (Id. ¶ 84)

Smith, however, has offered admissible evidence that puts into dispute most of the allegations listed above.  With respect to Defendants' complaints about his failure to complete various reports, Smith offered admissible evidence that other employees were responsible for the report in question (Pltf. R. 56.1 Stat. ¶ 69, Ex. 13)

3

(fixed asset report), that he produced the required report (Pltf. R. 56.1 Stat. ¶¶ 70, 72, Ex. 1 at 145:20-146:25, Ex. 14) (budget report and budget calendar), or that other employees in the School District refused to give him information that was essential to the preparation of the report.  (Pltf. R. 56.1 Stat. ¶ 71, Ex. 1 at 298:5-300:12) (health insurance comparison)  Smith testified that his report regarding state aid was not erroneous and relied on information obtained from the State Education Department (Pltf. R. 56.1 Stat. ¶ 73, Ex. 1 at 326:17-327:14), and offered evidence that the School District clerk did not receive any formal training because "BOCES does not offer any formal training for this job title."  (Pltf. R. 56.1 Stat. ¶ 75, Ex. 16)

With respect to contacting the School District's legal counsel, Smith testified that Yazurlo had previously told him that he did not have "a problem with [Smith] going to [the] School District's attorneys. . . ."  (Pltf. R. 56.1 Stat ¶ 76, Ex. 3 at 192:14-193:18)  As to feigning illness to avoid giving a budget presentation, Smith testified that he was in fact sick that day. (Pltf. R. 56.1 Stat. ¶ 77, Ex. 1 at 342:8-24, Ex. 17)  Smith denies firing the secretary (Pltf. R. 56.1 Stat. ¶ 79, Ex. 3 at 176:8-23, Ex. 18) and likewise denies reducing Johanna Scrivo to tears, claiming instead that Scrivo become "irate because [he] asked her to complete an assignment and she refused to." (Pltf. R. 56.1 Stat. ¶ 80, Ex. 1 at 92: 4-11)

Finally, Smith concedes that a sexual harassment complaint was filed against him, but testified that Yazurlo said he believed the complaint was "bullshit." (Pltf. R. 56.1 Stat. Ex. 1 at 230:2-11)

After parsing through the record, the undisputed material facts regarding Smith's job performance are:  (1) Smith had strained relationships with Yazurlo, Tantillo,

4

and the Assistant Superintendent for Special Education, Abbey Deschappelles.  (Def. R. 56.1 Stat. ¶ 78; Pltf. Ex. 1 at 252:13-20); (2) a sexual harassment complaint was made against Smith (Def. R. 56.1 Stat. ¶ 78); (3) Smith violated School District protocol by directing complaints about his employment to Board President Reich instead of his supervisor, Superintendent Yazurlo (id. ¶¶ 80-81); (4) Smith was unable to answer certain questions that Tantillo asked him about a "Zero-Based Budget" (id. ¶ 84); and (5) Tantillo expressed concerns to Yazurlo that Smith "was not competent or capable."  (Id.)

### C.     Evidence of Yazurlo's Racial Animus and Retaliatory Motive

Smith has also offered evidence of two incidents demonstrating Yazurlo's alleged racial animus and retaliatory motive.  In November 2001, near the Thanksgiving holiday, Smith was standing outside the high school talking to Yazurlo.  (Pltf. R. 56.1 Counterstat. ¶ 28)  Justine Redding, an African-American teacher in the School District, approached.  (Pltf. R. 56.1 Counterstat. ¶ 29)  According to Smith, Yazurlo turned to her, grabbed her by the arm, told her to give him "some of the brown sugar," and forcibly kissed her on the mouth.  (Pltf. R. 56.1 Counterstat. ¶ 29)  Shocked by Yazurlo's conduct, Smith alleges that he told the Superintendent that his conduct was "inappropriate" and that it was "a sexual harassment act."  (Pltf. Ex. 1 at 225:4-8, 23-25, Ex. 3 at 85:8)  Smith claims that Yazurlo responded, "Who are you to question what I do?"  (Pltf. R. 56.1 Counterstat. ¶ 36)  Redding – who filed an EEOC charge concerning this incident – corroborates Smith's account.[3]  (Pltf. Ex. 4 at 38:4-6, 43:19-23, 55:14)

---

[3]  Yazurlo admits that he made the "brown sugar" remark to Redding but denies that he kissed Redding on the mouth.  (Yazurlo Aff. ¶ 44)  Yazurlo further claims that Smith did not witness this incident; that he learned about it from Yazurlo; that it occurred in the School District hallway; and that only Board Member Anthony Buonocore was present.

Smith further alleges that on December 6, 2001 – the day before Yazurlo told Smith that he was going to recommend to the Board that Smith be fired – Smith saw Yazurlo talking to middle-school principal Anthony DiCarlo as Smith was exiting the high school building.  (Pltf. Ex. 1 at 170:7-8, 21-22)  As Smith approached, Yazurlo allegedly "looked directly at [him]" and called him a "fucking or freaking nigger."  (Id. at 171:4-6, 191:16-18)  Smith alleges that Yazurlo then added, "Carl, oh shit!"[4]  (Id. at 171:5-6)

### D.    Smith's Termination and Lawsuit

On December 3, 2001, Yazurlo told Smith that he had grave concerns about his job performance.  (Pltf. R. 56.1 Stat., Ex. 8 at 181:22-23, 182:6-8)  That same day, Smith sent Yazurlo a memo in which he asked for permission to speak with the Board about issues Smith had with Yazurlo.  (Pltf. R. 56.1 Stat., Ex. 6)  Yazurlo denied this request on December 5, 2001.  (Pltf. R. 56.1 Stat., Ex. 7)

On December 7, 2001, Yazurlo and Assistant Superintendent Tantillo informed Smith that Yazurlo would be recommending to the Board that Smith be fired. (Yazurlo Aff. ¶ 21; Pltf. Ex. 12)  The Board terminated Smith's employment on January 7, 2002, effective February 7, 2002.  (Yazurlo Aff. ¶ 3)

On January 8, 2002, Smith sent Board President Reich a letter alleging that the reasons used to justify his termination were fabricated.  (Pltf. Ex. P)  In his letter,

---

(Id.)  Buonocore testified that he witnessed Yazurlo's remark, that Smith was not present, that Yazurlo and Redding "peck[ed]" each other on the cheek, and that Redding wished Yazurlo a "good Thanksgiving" as she walked away.  (Buonocore Aff. ¶ 15)

[4] Both Yazurlo and DiCarlo deny that Yazurlo made this remark.  (Yazurlo Aff. ¶ 43; DiCarlo Aff. ¶ 8)

Smith claimed that Yazurlo had referred to him as a "nigger" shortly before he was fired. Smith also revealed that he had been tape-recording conversations with his co-workers since at least November 2001.  (Id.)

After Smith's termination, Yazurlo learned that Smith was asked to resign from his prior position.  (Def. R. 56.1 Stat. ¶ 2)  In his application for the Director of Finance position, Smith had stated that no employer had ever asked for his resignation.[5] (Def. Ex. O)

Smith filed an EEOC charge on August 24, 2002, and received a right-to-sue letter on July 11, 2003.  He filed the Complaint in this action on October 8, 2003, alleging:  (1) wrongful discharge under Title VII; (2) wrongful discharge under N.Y. Exec. L. §§ 296 and 297; (3) retaliation under Title VII; and (4) retaliation under N.Y. Exec. L. §§ 296 and 297.[6]

## DISCUSSION

Defendants argue that they are entitled to summary judgment on Smith's wrongful discharge claims because (1) there is overwhelming evidence that Smith was not qualified for his job and was fired because of his incompetence; and (2) the "same actor" – Yazurlo – both recommended that Smith be hired and recommended that he be fired four months later, and it is implausible that Yazurlo developed racial bias during

_____

[5]  Smith does not dispute that he was asked to resign from his previous job.  (Pltf. R. 56.1 Counter-Stat. ¶ 28)  With respect to the misrepresentation on his application for the finance director position, Smith testified that he is "not so certain [he] checked [the box]" indicating that no employer had ever asked for his resignation. (Pltf. R. 56.1 Stat. ¶ 88, Ex. 1 at 286:21-22) This equivocal denial is insufficient to put this fact in dispute.

[6]  This action was reassigned to this Court on November 3, 2008.

that four month period.  (Def. Br. 14-17)  Defendants' motion concerning Smith's Title VII wrongful discharge claim must be denied, however, because Smith has offered evidence that Yazurlo used a racially derogatory term in addressing Smith the day before Yazurlo informed Smith that he would be recommending that Smith be fired.  Moreover, because Smith has offered evidence disputing many of Defendants' criticisms concerning his job performance, this Court cannot rule as a matter of law that no reasonable jury could find that Smith was fired because of racial animus.

Defendants contend that Smith's retaliation claims must be dismissed because he has not offered evidence demonstrating a causal connection between his protected activity and his termination.  Defendants also renew their argument that Smith was terminated because of his poor job performance.  Smith has offered evidence, however, that (1) he informally complained to Yazurlo about the Superintendent's treatment of Redding on the day the alleged misconduct occurred; and (2) this incident and Smith's alleged complaint took place before Defendants terminated Smith's employment.  Because Smith has offered evidence that he engaged in protected activity and was terminated a short time later – on the recommendation of the supervisor he complained to and about – Smith has made out a prima facie case of retaliation under Title VII.  In light of the short time span between Smith's protected activity and his termination, and the disputed facts concerning the reasons why Smith was terminated, this Court cannot rule as a matter of law that Defendants' proffered reasons for firing Smith were not pretextual and that Smith's discharge was not retaliatory.

Smith's state law claims concerning wrongful discharge and retaliation will be dismissed, however, because they were not filed within the one-year statute of limitations provided by N.Y. Educ. L. § 3813.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  At summary judgment, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation omitted).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . [He] must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor."  Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion.  Gross v. National Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Instead, the plaintiff must offer "concrete particulars."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985)  ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

## II.   LEGAL ANALYSIS

### A.   Burden-Shifting Framework

Smith's claims under Title VII allege wrongful discharge based on racial animus and retaliation.  "Title VII cases[] can be characterized as 1) pretext cases and 2) mixed motive cases."  Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997).  The former analysis applies when "there is no evidence of direct discrimination," see Ahmed v. Heartland Brewery L.L.C., 05 Civ. 2652 (PKC), 2007 WL 2125651, at *5 (S.D.N.Y. Jul. 25, 2007), and these "cases. . . use the familiar burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973))."  Raskin, 125 F.3d at 60.  Under this framework,

> the plaintiff bears the initial burden of establishing a prima facie case of
> discrimination.  If the plaintiff does so, the burden shifts to the defendant
> to articulate some legitimate, non-discriminatory reason for its action.  If
> such a reason is provided, plaintiff may no longer rely on the presumption

> raised by the prima facie case, but may still prevail by showing, without
> the benefit of the presumption, that the employer's determination was in
> fact the result of . . . discrimination.  "The ultimate burden of persuading
> the trier of fact that the defendant intentionally discriminated against the
> plaintiff remains at all times with the plaintiff."

Holcomb, 521 F.3d at 138 (quoting Burdine, 450 U.S. at 253) (quotation omitted).

However, where a plaintiff shows that "an impermissible criterion in fact entered into the employment decision, a somewhat different analysis takes place."  Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1181 (2d Cir. 1992).  In these so-called mixed-motive cases, courts use the analysis set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989) superseded by statute on other grounds, Civil Rights Act of 1991.  At the first stage of the mixed-motive analysis, a plaintiff must show that "a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision. . . ."  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 173 (2d Cir. 2006) (citing Raskin, 125 F.3d at 60 citing Price Waterhouse, 490 U.S. at 258).  "'Evidence potentially warranting a Price Waterhouse burden shift includes, inter alia, policy documents and evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude.'"  Id. at 173-74 (quoting Raskin, 125 F.3d at 60) (internal quotation marks and citation omitted) (emphasis in Raskin).  In other words, "[t]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."  Id. at 174 (quoting Raskin, 125 F.3d at 61).

At the second stage of the Price Waterhouse analysis, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway," Raskin, 125 F.3d at 60:

> "'An employer may not, in other words, prevail in a mixed-motives case
> by offering a legitimate and sufficient reason for its decision if that reason
> did not motivate it at the time of the decision.'  Nor may the employer
> 'meet its burden in such a case by merely showing that at the time of the
> decision it was motivated only in part by a legitimate reason.'"

Bookman v. Merrill Lynch, 02 Civ. 1108 (RJS), 2009 WL 1360673, at *11 (S.D.N.Y.

May 14, 2009) (quoting Scully v. Summers, 95 Civ. 9091 (PKL), 2000 WL 1234588, at

*15 (S.D.N.Y. Aug. 30, 2000) quoting Price Waterhouse, 439 U.S. at 252).

      "However, regardless of whether the Price Waterhouse or McDonnell

Douglas framework is applied, the ultimate issue is:  'Whether the plaintiff has presented

evidence from which a rational finder of fact could conclude that the defendant

discriminated against [him] illegally.'"  Id. (quoting Jalal v. Columbia Univ., 4 F. Supp.

2d 224, 233 (S.D.N.Y. 1998)).

      **B.**    **Defendants Are Not Entitled to Summary Judgment
On Smith's Title VII Wrongful Discharge Claim**

      **1.**    **Smith Has Presented Sufficient Evidence to Warrant
a Burden Shift Under the Price Waterhouse Analysis**

      Smith offers two pieces of "smoking gun" evidence that demonstrate

Defendants' racial animus:  (1) Yazurlo – his supervisor and the individual who

recommended that Smith be fired – called Smith a "nigger" the day before Smith's

termination (Pltf. R. 56.1 Counter-Stat., ¶ 51); and (2) Yazurlo told Redding, Smith's

African-American co-worker, to give him "some of that brown sugar" and then pulled her

to him and forcibly kissed her on the mouth.  (Id. ¶¶ 28-31)

      The Second Circuit has cautioned that "all comments pertaining to a

protected class are not equally probative of discrimination. . . ."  Tomassi v. Insignia Fin.

Group, Inc., 478 F.3d 111, 115 (2d Cir. 1007).  In determining whether a comment is

probative of discriminatory intent, courts consider "the following factors:  (1) who made the remark, i.e., a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) whether it was related to the decision-making process."  Pronin v. Raffi-Custom Photo Lab, Inc., 383 F. Supp. 2d 628, (S.D.N.Y. 2005) (citations omitted); see also Tomassi, 478 F.3d at 115 ("The more the remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.")

Given the racial epithet Yazurlo allegedly used, the fact that he was Smith's supervisor, and the fact that Yazurlo allegedly used this racial epithet the day before he informed Smith that he would be recommending Smith's termination, Smith has presented sufficient evidence to warrant a Price Waterhouse burden shift.  See Price Waterhouse, 490 U.S. at 235, 250 (suggestions that plaintiff "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry" and other gender-based comments warranted mixed-motive burden shift); Bookman, 2009 WL 1360673, at *6, 13 (supervisors' comments such as "it's better than sitting at the back of the bus" and "the future of the office lay with young White brokers" were sufficient to warrant a Price Waterhouse burden shift).

### 2.    Defendants Have Failed to Show That They Would Have Fired Smith Absent Racial Animus

Because Smith produced evidence that racial animus played a "motivating part" in his termination, "the burden shifts to [Defendants] to prove by a preponderance of the evidence that [they] would have made the same decision anyway."  Raskin, 125

F.3d at 60.  Defendants have articulated two theories as to why they should be granted

summary judgment despite the <u>Price Waterhouse</u> burden shift.  First, Defendants argue

that because the same person – Yazurlo – recommended that Smith be hired and

ultimately recommended that he be terminated, no reasonable jury could find that

Yazurlo was motivated by discriminatory animus.  Second, Defendants argue that they

would have fired Smith regardless of any racial animus, given the numerous problems

with his job performance.

**a.      The Same-Actor Inference Does Not, as a
Matter of Law, Overcome Evidence of
<u>Yazurlo's Discriminatory Animus</u>**

The Second Circuit has noted that "when the person who made the

decision to fire was the same person who made the decision to hire, it is difficult to

impute to [that person] an invidious motivation that would be inconsistent with the

decision to hire."  <u>Grady v. Affiliated Central, Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997).

"This is especially so when the firing has occurred only a short time after the hiring."  <u>Id.</u>

(citations omitted).

The same-actor inference is not dispositive, however, when the decision-

maker makes comments demonstrating discriminatory animus.  <u>See</u> <u>Phillips v. Dow</u>

<u>Jones Co.</u>, 04 Civ. 5178 (DAB), 2009 WL 2568437, at *15 (S.D.N.Y. Aug. 17, 2009)

(denying employer's summary judgment motion – even though the same supervisor hired

and fired plaintiff – partially because the supervisor made numerous racial remarks);

<u>Braunstein v. Barber</u>, 06 Civ. 5978 (CS), 2009 WL 1542707, at *1 (S.D.N.Y. Jun. 2,

2009) ("The same-actor inference is not dispositive, particularly where, as here, there is

evidence that such actor made comments that could be construed as overtly

14

discriminatory."); <u>Bookman</u>, 02 Civ. 1108 (RJS), 2009 WL 1360673, at *14 (S.D.N.Y.

May 14, 2009) ("Simply put, in light of the evidence in the record of discriminatory

comments by [plaintiff's supervisors], the application of the 'same actor' inference at this

stage would improperly usurp the role of the fact finder.")  Accordingly, given the

evidence Plaintiff has offered of Yazurlo's discriminatory animus, the same-actor

inference does not warrant granting Defendants judgment as a matter of law.

**b.**   **There Are Genuine Issues of Material
Fact as to Whether Defendants Would
<u>Have Fired Smith Absent Racial Animus</u>**

Defendants have likewise failed to show that they would have fired Smith

absent discriminatory animus.  Although Defendants have offered many complaints about

Smith's job performance, as discussed above, Smith offered admissible evidence creating

material issues of fact as to his alleged poor performance.  Smith has also testified that in

"late November" – just days before Yazurlo told Smith that he would be recommending

to the Board that Smith be fired – Yazurlo told Smith that he "was doing [the] job better

than anybody had ever done it."  (Pltf. R. 56.1 Stat., Ex. 1 at 317:6-8)

In light of the evidence of Yazurlo's discriminatory animus, and given that

Smith has created issues of fact concerning most of Defendants' reasons for terminating

him, this Court cannot rule as a matter of law that Defendants have "proffered a

legitimate reason for Plaintiff's termination" that – "'standing alone' – would have

induced [them] to make the same decision."[7]  <u>Bookman</u>, 2009 WL 1360673, at *16

---

[7]  Although the Court has performed a mixed-motive analysis, the result would be the
same under the <u>McDonnell Douglas</u> framework.  <u>See</u> <u>Bookman</u>, 2009 WL 1360673, at
*16 n. 10; <u>Jalal</u>, 4 F. Supp. 2d at 234.  "Simply put, regardless of whether the burden of
proof ultimately falls on Defendant under <u>Price Waterhouse</u>, or remains with Plaintiff

15

(quoting Scully, 2000 WL 1234588, at *15).  Accordingly, Defendants' motion for

summary judgment on Smith's Title VII wrongful discharge claim will be denied.[8]

### C.   Defendants Are Not Entitled to Summary Judgment On Smith's Title VII Retaliation Claim

#### 1.   Smith Established a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, an employee must show "(1)

participation in a protected activity; (2) that the defendant knew of the protected activity;

(3) an adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action."  McMenemy v. City of Rochester, 241 F.3d

279, 282-83 (2d Cir. 2001).  Defendants do not argue that Smith failed to establish the

first three elements of a prima facie case but claim that Smith has not demonstrated the

fourth element, because he made no formal complaint about Yazurlo's conduct until after

the Board terminated his employment.  (Def. Br. 21-22)

Contrary to Defendants' arguments, the Second Circuit has recognized

that Title VII "'protects employees in the filing of formal charges of discrimination as

well as in the making of informal protests of discrimination, including making complaints

---

under McDonnel Douglass, disputed issues of fact preclude resolution of this issue in a motion for summary judgment."  Bookman, 2009 WL 1360673, at *16 n. 10.

[8]  While Smith has not offered admissible evidence that the Board's decision to terminate him was motivated by racial prejudice, "a plaintiff may . . . defeat summary judgment by showing that an individual who was motivated by unlawful intent played a 'meaningful role' in the decision."  Mugavero v. Arms Acres, Inc., 03 Civ. 5724, 2009 WL 890063, at *19 (S.D.N.Y. Mar. 31, 2009) (citing Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir.1999) ("We recognize that the impermissible bias of a single individual at any stage of the ... [decision making] process may taint the ultimate employment decision in violation of Title VII.  This is true even absent evidence of illegitimate bias on the part of the decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . [decision making] process.").  Here a reasonable jury could find that Yazurlo played a "meaningful role" in the Board's decision to terminate Smith's employment.

to management. . . .'"  <u>Stofsky v. Pawling Cent. Sch. Dist.</u>, 06 Civ. 10231 (KMK), -- F.

Supp. 2d ---, 2009 WL 804085 (S.D.N.Y. Mar. 27, 2009) (quoting <u>Matima v. Celli</u>, 228

F.3d 68, 78 (2d Cir. 2000)).  When Smith complained to Yazurlo about his sexual

harassment of Redding, Smith engaged in protected activity.  Accordingly, Smith has

made out a <u>prima</u> <u>facie</u> case of retaliation under Title VII.

### 2.   A Reasonable Jury Could Conclude that Defendants' Reason for Firing Smith Was Pretextual

Defendants have submitted evidence that Smith was fired for poor

performance, and have thus put forth a legitimate, nondiscriminatory reason for his

termination.  Because Defendants have met their burden at this stage, "the presumption of

retaliation dissipates," and Smith must offer evidence from which a jury could find "that

retaliation was a substantial reason for the adverse employment action."  <u>Jute v. Hamilton</u>

<u>Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005).  "The plaintiff may rely upon the

same evidence that comprised [his] <u>prima</u> <u>facie</u> case, 'depending on how strong [that

evidence] is.'"  <u>Pasqualini v. Mortgageit, Inc.</u>, 05 Civ. 9714 (LAP), 2009 WL 2407651, at

*14 (S.D.N.Y. Aug. 5, 2009) (quoting <u>Back v. Hastings on Hudson Union Free Sch.</u>

<u>Dist.</u>, 365 F.3d 107, 123 (2d Cir. 2004)).  Smith's evidence of a retaliatory motive

consists of the events that led up to his termination, the timing of those events, and

Yazurlo's role in those events.

Construing the evidence in a light most favorable to Smith, the record

reveals the following:  In "late November," Yazurlo told Smith he "was doing [the] job

better than anybody had ever done it."  (Pltf. R. 56.1 Stat., Ex. 1 at 317:6-8)  "[A]round

the Thanksgiving holidays," Redding approached Smith and Yazurlo as they were talking

outside of the high school. (Pltf. R. 56.1 Stat., Ex. 1 at 205:2-16, 317:6-8; Ex. 4 at 38:21-

22)  Yazurlo grabbed Redding by the arm, told her to give him "some of the brown sugar," and forcibly kissed Redding on the mouth.  (<u>Id.</u> Ex. 1 at 206:6-207:6) Immediately after Redding left, Smith made an informal complaint about the incident to Yazurlo, telling Yazurlo that his conduct was "inappropriate" and that it was "a sexual harassment act."  (<u>Id.</u> at 225:4-8; 23-25, Ex. 3 at 85:8)

On December 3, 2001, approximately a week or two after the incident with Redding, Yazurlo had his first "detailed meeting" with Smith about Yazurlo's "concerns regarding [Smith's] performance to date."  (Pltf. R. 56.1 Stat., Ex. 8 at 181:22-23, 182:6-8)  On December 4, 2001, Yazurlo sent Smith a memo regarding the concerns he had raised at the December 3, 2001 meeting; this memo required Smith's signature. (Def. R. 56.1 Stat., Ex. N)  Yazurlo testified that he asked Smith to sign this memo because he wanted to put it in Smith's personnel file; Yazurlo admits that this was the first time he had placed a memo in Smith's personnel file.  (Pltf. R. 56.1 Stat., Ex. 8 at 177:2-178:7)  That same day, Smith sent Yazurlo a memo in which he asked to speak to the Board about his concerns regarding Yazurlo.  (Pltf. R. 56.1 Stat., Ex. 6)  Yazurlo denied this request on December 5, 2001.  (Pltf. R. 56.1 Stat., Exs. 7)  Two days later, on December 7, 2001, Yazurlo told Smith that he was going to recommend to the Board that Smith be fired.  (Pltf. R. 56.1 Stat., Ex. 12)

Smith has offered evidence demonstrating a strong temporal connection between his protected activity and his discharge.  Yazurlo began putting together a paper record against Smith less than two weeks after Smith complained to Yazurlo about his sexual harassment of Redding, and a few days later Yazurlo told Smith that he was going to recommend that Smith be fired.  It is well-established that a short time span between

protected activity and an adverse employment action can establish pretext.  See Jute, 420

F.3d at 180 (finding a reasonable jury could conclude employer's reason for firing

plaintiff was pretextual solely because "[plaintiff] has proffered evidence supporting a

strong temporal connection between her involvement in protected activity . . . and

instances of retaliation. . . ."); Mugavero v. Arms Acres, Inc., 03 Civ. 5724, 2009 WL

890063, at *21 (S.D.N.Y. March 31, 2009) (denying summary judgment on retaliation

claims when one adverse employment action occurred a few days after the protected

activity); Tainsky v. Clarins USA, Inc., 363 F. Supp. 2d 578, 582 (S.D.N.Y. 2005)

(denying summary judgment on a retaliation claim where the termination occurred

approximately a month after plaintiff complained of harassment); Goodwin v. Orange &

Rockland Utils., 04 Civ. 0207 (WCC), 2005 WL 2647929, at *10-11 (S.D.N.Y. Oct. 14,

2005) (denying summary judgment when plaintiff was terminated a month after she

engaged in a protected activity).

   While Defendants have raised a litany of complaints about Smith's job

performance, Smith has offered evidence that creates a material issue of fact concerning

his job performance.  If a jury accepts Smith's version of events, it could conclude that it

is more likely than not that Smith was terminated because of a retaliatory motive instead

of poor job performance.  See Eldaghar v. City of New York Dep't of Citywide

Administrative Servs., 02 Civ. 9151 (KMW), 2008 WL 2971467, at *13 (S.D.N.Y. Jul.

31, 2008) (denying summary judgment on a retaliation claim because "[p]laintiff raises

triable issues regarding the accuracy of some of the information contained in the

probationary reports and memoranda documenting Plaintiff's allegedly unsatisfactory job

performance"); McKinney v. Lanier Worldwide, Inc., 94 Civ. 8139 (MGC), 1998 WL

677544, at *6 (S.D.N.Y. Sept. 29, 1998) (denying summary judgment on a retaliation

claim where "[p]laintiff disputes defendant's evaluation of his performance and its claims

of customer complaints").

       Because there are genuine issues of material fact as to whether

Defendants' reasons for terminating Plaintiff were pretextual, Defendants' motion for

summary judgment on Smith's Title VII retaliation claim will be denied.

       **D.**    **<u>Smith's State Law Claims Are Time-Barred</u>**

       Smith also asserts wrongful discharge and retaliation claims under

Executive Law §§ 296 and 297.  Smith's claims against the School District are governed

by the one-year statute of limitations set forth in Education Law § 3813(2-b), which

applies to damage claims for workplace discrimination brought under Executive Law

§ 296 against a school district.  <u>Amorosi v. S. Colonie Independent Cent. Sch. Dist.</u>, 9

N.Y.3d 367, 849 N.Y.S.2d 485, 489 (2007).  Smith's claims against Yazurlo are likewise

governed by a one-year limitations period, because Education Law §§ 3813(1) and (2-b)

apply to any suit brought against a "school district . . . or any <u>officer</u> of a school

district. . . ." and superintendents such as Yazurlo are "officers" that fall within the scope

of Section 3813.  <u>See</u> <u>Fierro v. City of New York</u>, 591 F. Supp. 2d 431, 446-47 (S.D.N.Y.

2008), <u>rev'd on other grounds by</u> 2009 WL 2223067 (2d Cir. July 27, 2009) (finding that

school district superintendents were "officers" within the meaning of § 3813(1)); <u>DeRise</u>

<u>v. Kreinik</u>, 10 A.D.3d 381, 381, 780 N.Y.S.2d 773, 774 (2d Dep't 2004) (finding that §

3813's notice of claim provision applies to a suit against a superintendent).

       Here, Smith's cause of action accrued on January 7, 2002 – the day the

School District told Smith that it was terminating his employment.  <u>See</u> <u>Newman v.</u>

Leroy Cent. Sch. Dist., 07 Civ. 6299, 2008 WL 974699, at *5 (S.D.N.Y. Apr. 8, 2008)

("In employment discrimination cases, courts have consistently held that the timeliness of

the claim 'is measured from the date the claimant receives notice of the allegedly

discriminatory decision.'") (quoting Putkowski v. Warwick Valley Cent. Sch. Dist., 363

F. Supp. 2d 649, 655 (S.D.N.Y. 2005) citing Morse v. Univ. of Vermont, 973 F.2d 122,

125 (2d Cir. 1992)).  Because Smith brought suit in this Court on October 8, 2003 – more

than a year after his cause of action accrued – his state law claims are time-barred and

will be dismissed.[9]  See Fierro, 591 F. Supp. 2d at 446-47 (dismissing New York City

---

[9]  Smith has not argued that the filing of his EEOC charge tolled the statute of limitations
under Education Law § 3813(2-b), and accordingly has waived this argument.  NML
Capital, Ltd. v. Republic of Argentina, 05 Civ. 2434 (TPG), 2009 WL 1528535, at *1
(S.D.N.Y. May 29, 2009) (finding defendant "waived this argument by failing to raise it
in opposition to plaintiffs' motion for summary judgment"); Morgan ex. rel. Morgan v.
Barnhart, 04 Civ. 6024 (LTS) (AJP), 2005 WL 2338709, at *1 (S.D.N.Y. Sept. 26, 2005)
("The Court declines to consider this argument because it was not raised by [plaintiff] in
opposition to the [defendant's] motion for judgment on the pleadings. . . . ").  If the time
during which Smith's EEOC charge was pending is excluded (August 24, 2002 to July
11, 2003), Smith's Executive Law claims would be within the one-year limitations
period, because Smith learned of his termination on January 7, 2002 and filed this lawsuit
on October 8, 2003.

The Second Circuit has not addressed whether the filing of an EEOC charge as a general
matter tolls state law claims, and no court has ruled as to whether an EEOC charge tolls
Education Law § 3813(2-b).  Lower courts have held that the filing of an EEOC charge
tolls the three-year statute of limitations generally applicable to claims under the New
York State Human Rights Law and the New York City Human Rights Law, see Dauer v.
Verizon Communications Inc., 613 F. Supp.2d 446, 452 (S.D.N.Y. 2009); Siddiqi v. New
York City Health & Hosp. Corp., 752 F.Supp.2d 353, 373 (S.D.N.Y. 2008), but as noted
above, the New York Court of Appeals has ruled that the three-year limitations period
generally applicable to employment discrimination actions does not apply in cases
brought against school districts and their officers.  Amorosi, 9 N.Y.2d 367, 849 N.Y.S.2d
at 489.

With respect to state law torts, the overwhelming weight of authority is that the filing of
an EEOC charge does not toll the statute of limitations.  See, e.g., Pasqualini v.
MortgageIT, Inc., 498 F. Supp. 2d 659, 668 (S.D.N.Y. 2007) (holding that statute of

limitations applicable to plaintiff's intentional infliction of emotional distress and assault and battery claims was not tolled during the pendency of his EEOC charge); Gardner v. St. Bonaventure Univ., 171 F. Supp. 2d 118, 129 (W.D.N.Y. 2001) ("[t]he weight of authority" among district courts in the Second Circuit and in other Circuits "is against tolling state [tort] claims during the pendency of the [administrative charge]"; Hargett v. Met. Transit Auth., 552 F. Supp. 393, 399-401 (S.D.N.Y. 2008) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); Callahan v. Image Bank, 184 F. Supp. 2d 362, 363 (S.D.N.Y. 2002) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); Duran v. Jamaica Hosp., 216 F. Supp. 2d 63, 67-68 (E.D.N.Y. 2002) (statute of limitations for slander claim was not tolled during pendency of EEOC charge); Abdallah v. City of New York, No. 95-Civ.-9427(MGC), 2001 WL 262709, at *6 (S.D.N.Y. Mar. 16, 2001) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); Tovar v. KLM Royal Dutch Airlines, No. 98-Civ.-5178(LAP), 2000 WL 1273841, at *3 (S.D.N.Y. 2000) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); Stordeur v. Computer Assoc. Int'l, Inc., 995 F. Supp. 94, 99-102 (E.D.N.Y. 1998) (statute of limitations for "intentional infliction of extreme emotional distress" and slander claims was not tolled during pendency of EEOC charge); Ashjari v. NYNEX Corp., No. 93-Civ.-0751(RPP), 1998 WL 699520, at *1 (S.D.N.Y. Oct. 2, 1998) (dismissing pro se employment discrimination plaintiff's assault and battery claims as untimely), aff'd, 182 F.3d 898 (table op.), 1999 WL 464977, at *1 (2d Cir. June 22, 1999) (citing Johnson v. Railway Express Agency, Inc., 421 U.S. 454 (1975), for the proposition that "an EEOC charge does not toll the time for state law claims arising from the same events").  One court has reached the same holding as to a claim brought under a whistleblower provision of the Labor Law.  Gray v. Shearson Lehman Bros., Inc., 947 F. Supp. 132, 137 (S.D.N.Y. 1996) (holding that statute of limitations for state law whistleblower claim was not tolled during pendency of discrimination charge before the state Department of Human Rights and the EEOC).

Even if Smith had not waived the argument that his EEOC charge tolled the statute of limitations set forth in Education Law § 3813(2-b), this Court would not be inclined – in light of Amorosi and the clear intent of the New York legislature to limit lawsuits against school districts – to read such a provision into the statute.  As one Court noted in considering (but not reaching) this issue:

> Declining to find that the filing of an administrative charge with the EEOC tolls the one-year period of limitations applicable to Plaintiffs' NYHRL claims is also "consistent with the general principle that statute of limitations schemes are exclusively the prerogative of the legislative [branch] and, absent a clear legislative declaration that any tolling is permissible, the courts should be reluctant to imply one.

Human Rights law claims asserted against the Department of Education pursuant to

§ 3813(2-b) because the claims were filed more than a year after plaintiff's cause of

action arose); Williams v. City of New York, 99 Civ. 2697, 2006 WL 2668211, at *25

(E.D.N.Y. Sept. 11, 2006) (dismissing a N.Y. Exec. L. § 296 claim asserted against the

New York City Board of Education because the suit was brought more than a year after

the cause of action accrued).[10]

### E.   Defendants Are Not Entitled to Summary Judgment Concerning Their After-Acquired Evidence Claim

The Supreme Court has held that "evidence that the employee would have

been terminated for lawful reasons will make certain remedies, such as reinstatement and

front pay, unavailable," Greene v. Coach, Inc., 218 F. Supp. 2d 404, 412 (S.D.N.Y.2002)

(citing McKennon v. Nashville Banner Pub'g Co., 513 U.S. 352, 362, 115 S.Ct. 879, 130

L.Ed.2d 852 (1995)), and that an award of back pay may properly "be limited [in such

cases] to salary lost from the date of the unlawful discharge until the date the employer

discovered the information which would have led to discharge on lawful grounds."

Flores v. Buy Buy Baby, Inc., 118 F. Supp. 2d 425, 432-33 (S.D.N.Y.2000) (citing

---

Field v. Tonawanda City School District, 604 F. Supp.2d 544, 579 n.26 (W.D.N.Y. 2009) (quoting Gardner, 171 F. Supp.2d at 131).

[10]  Defendants also argue that Smith's Title VII claims must be dismissed because he failed to file a charge with the EEOC within 180 days of the alleged discriminatory act. "The law is clear[, however,] that a claimant must file a charge of discrimination in New York within 300 days of the alleged discriminatory action." Gupta v. New York City Sch. Construction Auth., 04 Civ. 2896, 2007 WL 1827418, at *4 (E.D.N.Y. Jun. 25, 2007) (citing 42 U.S.C. S 2000e-5(e)(1); 29 U.S.C. S 626; Tewksbury v. Ottaway Newspapers, 192 F.3d 322 (2d Cir. 1999); Torrico v. Int'l Bus. Machine Corp., 319 F. Supp. 2d 390, 401 (S.D.N.Y. 2004)).  Because Smith filed his EEOC charge on August 24, 2002 (Yazurlo Aff., Ex. R) within 300 days of learning of his termination on January 7, 2002, his Title VII claims are not time-barred.

McKennon, 513 U.S. at 361-62).  Here, Defendants ask this Court to rule as a matter of

law that Smith has no claim for damages, arguing that they never would have hired Smith

if he had disclosed – as required by the School District's job application – that his prior

employer, the West Islip School District, had asked for his resignation.

        Damages may be limited under this theory only where "an employer [has]

establish[ed] that the wrongdoing was of such severity that the employee would have

been terminated on such ground alone if the employer had known of it at the time of

discharge."  Greene, 218 F. Supp. 2d at 412.  Summary judgment on this issue "is

inappropriate" where the plaintiff "raise[s] a material issue of fact as to whether the after-

acquired evidence would actually be a basis for termination." Id. at 413; Flores, 118 F.

Supp. 2d at 433 (denying summary judgment where "[t]here remain material issues of

relevant fact as to whether . . . [the employer] would have fired . . . [the plaintiff] solely

on the basis of her falsified employment application").

        Defendants have submitted affidavits asserting that Smith (1) never would

have been hired if he had disclosed that his prior employer had asked him to resign; and

(2) would have been fired as soon as his failure to disclose this fact became known.

(Yazurlo Aff. ¶ 41; Tantillo Aff. ¶ 23; Reich Aff. ¶ 14; Buonocore Aff. ¶ 16)

Defendants, however, have offered no evidence as to the School District and Board's

policies and practices with respect to (1) job applicants who were asked to resign from

their last position; and (2) employees who fail to disclose this fact on their job

application.  In particular, Defendants have offered no evidence as to how other School

District employees who made the same misrepresentation were disciplined.

Greene v. Coach, Inc., 218 F. Supp.2d at 413-14 is instructive as to the nature of proof that will support a grant of summary judgment limiting plaintiff's damage claim – on grounds of after-acquired evidence – where the factual basis is a falsified job application. There, the court granted summary judgment concerning plaintiff's claims for reinstatement and front pay where plaintiff had lied on her job application about having obtained a college degree and failed to disclose that she had been terminated from her last retail job for shoplifting. In support of its motion, Coach offered an affidavit from the prior employer explaining the circumstances of the plaintiff's termination, and offered an affidavit from its own human resources director detailing two prior cases in which employees had been terminated after Coach became aware that they had falsified their job history. There is no such proof here.

With respect to the circumstances of Smith's departure from his prior job, Smith has offered evidence indicating that he was not fired for poor performance. Smith testified that his previous employer asked him to resign because "forty percent of [his] job was being redistributed within the business office and . . . the remaining sixty percent . . . would not justify [his] position." (Pltf. Ex. 1 at 54:25-55:4) Moreover, it is undisputed that Yazurlo received "positive feedback" from Smith's references before he was hired (Yazurlo Aff. ¶ 14), and a glowing recommendation letter from the West Islip superintendent. (Pltf. Ex. 10)

In sum, Defendants' evidence supports their argument that Smith's conduct may "have been sufficient to support the termination of [his] employment," but does not establish as a matter of law that Defendants "'would have fired [Smith] solely on the

basis of [his] falsified employment application.'"[11] Greene, 218 F. Supp. 2d at 413 (quoting Flores, 118 F. Supp.2d at 423-33). Accordingly, Defendants' motion for summary judgment as to Plaintiff's damage claims will be denied.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Smith's New York Executive Law claims but is otherwise DENIED. The Clerk of the Court is directed to terminate the motion. [Docket No. 12]

Dated:      New York, New York
            September 30, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[11] Defendants have also not offered sufficient evidence concerning the Board's likely reaction to Smith's misrepresentation. Defendants have asserted that Smith was hired by a unanimous Board vote (see Coleman Aff., ¶ 8) but have offered affidavits on this point from only two Board members. A third Board member – Rev. Frank E. Coleman, Jr. – submitted an affidavit in support of Defendants' motion but did not address this issue. With respect to the two Board members who did address this issue – Reich and Buonocore – both swear that they would not have voted to hire Smith if they had known that he was asked to resign by his prior employer because of "deficiencies in his work and responsibilities." (Reich Aff., ¶ 14, Buonocore Aff., ¶ 16). As noted above, however, Smith has offered evidence that creates a material issue of fact as to why he was asked to resign by the West Islip School District.

26