UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL G. SMITH,

                    Plaintiff,

        -v-

TUCKAHOE UNION FREE SCHOOL
DISTRICT, and MICHAEL YAZURLO,
Superintendent of Schools, Tuckahoe
Union Free School District,

                    Defendants.

MEMORANDUM OPINION
AND ORDER

03 Civ. 7951 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Carl G. Smith seeks relief under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq. ("Title VII"), for alleged race

discrimination and retaliation by his former employer, Tuckahoe Union Free School

District ("the District"), and his former supervisor, Superintendent of Schools Michael

Yazurlo.  Smith claims that his employment was terminated based on Yazurlo's

recommendation that he be fired.  Smith contends that Yazurlo's recommendation was

based on (1) racial animus and (2) his desire to retaliate against Smith for complaining

about Yazurlo's sexual harassment of and use of a racially charged term with an African-

American employee.  Following a five-day trial, the jury rendered a verdict in the

Defendants' favor on both claims.

        Pending before the Court is Smith's motion to set aside the verdict

pursuant to Fed. R. Civ. P. 50, and for a new trial pursuant to Fed. R. Civ. P. 59(a).

(Docket No. 43)  For the reasons stated below, Smith's motion is DENIED.

**BACKGROUND**

I.    **PROCEDURAL HISTORY**

Smith filed the Complaint in this action on October 8, 2003, alleging race

discrimination and retaliation claims under Title VII and state law relating to his

termination in 2001 from his position as Director of Finance.[1]  (Docket No. 1)

On September 30, 2009, the Court granted summary judgment on Smith's

state law claims because they were time-barred, but denied summary judgment as to the

Title VII claims because there were "disputed issues of material fact regarding the

reasons for Smith's termination and the events that led up to it."  Smith v. Tuckahoe

Union Free Sch. Dist., 03 Civ. 7951 (PGG), 2009 U.S. Dist. LEXIS 91106, at *1-2

(S.D.N.Y. Sept. 30, 2009).  Trial began on December 14, 2009, and the jury returned a

verdict on December 21, 2009, in Defendants' favor on both claims.

II.   **EVIDENCE AT TRIAL**

A.    **Smith's Hiring**

In the summer of 2001, Yazurlo and Assistant Superintendent for

Personnel Barbarann Tantillo conducted multiple rounds of interviews for the Director of

Finance position and ultimately selected Smith, an African-American, and one other

applicant for a final interview round with the Board of Education ("the Board").  Yazurlo

and Tantillo made their selection from a pool of mainly white applicants.  (Tr. 350:6-12;

Tr. 866:1-9)  After the final round interview, Yazurlo recommended to the Board that

---

[1]  This action was reassigned to this Court on November 3, 2008. (Docket No. 25)

Smith be hired.[2]  (Tr. 350:16-22; 486:5-11; 508:16-25; 870:9-13)  The Board

subsequently voted to hire Smith for a probationary three-year term as Director of

Finance.  (Tr. 353:16-354:10)

###     B.     The Redding "Brown Sugar" Incident

At trial, the jury heard conflicting testimony about an incident in which

Yazurlo used the term "brown sugar" with Justine Redding – an African-American

employee.

According to Smith, on November 21, 2001, he and Yazurlo were in

conversation outside the District's middle school when Dr. Redding approached.  As

Redding approached, Yazurlo allegedly "turned towards her, grabbed her on the arm and

forced her towards him and kissed her on the lips."  (Tr. 104:23-25)  Smith testified that

Yazurlo said "give me some of that brown sugar" just before kissing Redding. (Tr. 105:1-

3)  According to Smith, once Redding had walked away he immediately demanded that

Yazurlo apologize to both him and Redding.  (Tr. 106:5-18)  Yazurlo allegedly

responded by stating, "who are you to question me."  (Tr. 106:21-23)  Smith claims that

after the Thanksgiving holiday, he again demanded an apology, but that Yazurlo refused

and "laughed it off."  (Tr. 108:4-109:3)

Yazurlo admitted that he had used the term "brown sugar" with Redding,

but otherwise contradicted Smith's testimony.  According to Yazurlo, he encountered

Redding just before Thanksgiving in a school hallway; he made the "brown sugar"

comment as he touched cheeks with Redding to say goodbye and express his best wishes

for the holiday.  (Tr. 583:15-18)  Yazurlo denied that Smith was present for that incident,

---

[2]  Yazurlo testified that the Board could not fill a position absent his recommendation and
that the Board had never rejected his hiring recommendation.  (Tr. 435:19-25; 436:1-8)

and testified that Smith learned of the "brown sugar" remark from Yazurlo, who mentioned the remark in counseling Smith about a sexual harassment complaint that had been lodged against Smith.[3]   Yazurlo testified that he never discussed the "brown sugar" comment with Smith on any other occasion.  (Tr. 584:10-14)

Redding did not testify at trial, but portions of her deposition testimony were read to the jury.  These excerpts indicated that Redding had been "very shocked and upset" by Yazurlo's kiss and "brown sugar" comment, which Smith had witnessed.  (Tr. 313:13-316:24)  In addition, Redding stated at her deposition that Yazurlo had attempted to apologize to her on multiple occasions after the incident.  (Tr. 337:18-338:23) Redding further indicated that Yazurlo had told her that the impetus for his apologies was that Smith had approached him about the incident.  (Tr. 338:24-339:2)

Board Vice-President Anthony Buonocore testified that he was present for the pre-Thanksgiving encounter between Yazurlo and Redding.  Buonocore testified that when the two men met Redding, Yazurlo and Redding spoke briefly, and that when they parted, Yazurlo stated to Redding, "give me a little brown sugar."  Each then gave the other "a peck on the cheek, they smiled, she walked out, said goodbye, and that was that."  (Tr. 513:10-514:1)  Buonocore testified that Smith was not present for this encounter. (Tr. 514:2-8)

---

[3]  Yazurlo testified that he told Smith about his use of the term "brown sugar" with Redding in order to offer an example of a longstanding relationship in which he was free to "kid around."  Absent such a close relationship, Yazurlo counseled Smith that he needed to "be careful."  (Tr. 581:3-584:9)

C.      Yazurlo's Alleged Use of a Racial Epithet

According to Smith, he and Yazurlo had a heated argument on December 6, 2001, concerning Smith's complaint earlier that day to the Board President about Yazurlo's alleged unfair criticism of his job performance.  (Tr. 166:1-11)  Smith testified that Yazurlo called Smith into his office and told him, "how dare you speak to my boss about anything that goes on in this district behind my back."  (Tr. 168:19-22)  Smith described Yazurlo as "extremely visceral, irate and condescending."  (Tr. 168:20-24)  A short time later, as Smith was leaving the school building, he observed Yazurlo talking to middle school principal Anthony DiCarlo.  (Tr. 170:9-25)  According to Smith, as he approached the two men, Yazurlo called him a "fucking nigger."  (Tr. 170:20-25)  Yazurlo then allegedly said, "Carl, oh shit" and left abruptly.  (Tr. 170:23-171:6)

Yazurlo denied ever calling Smith a "nigger" or using any other racial epithet.  (Tr. 420:25-421:5)  DiCarlo testified that he had never heard Yazurlo direct a racial epithet at Smith.  (Tr. 839:8-10)

D.      Smith's Job Performance

Defendants offered extensive evidence concerning Smith's poor job performance as Director of Finance, and argued that he had been terminated because of his job performance and not because of racial or retaliatory animus.

Yazurlo testified that Smith, inter alia, failed to prepare a "fixed asset inventory" (Tr. 529:19-18); committed errors regarding athletic transportation costs (Tr. 531:2-533:3); failed to train the District Clerk despite Yazurlo's direct verbal and written instruction that he do so (Tr. 535:15-537:10; 543:16-544:24); failed to provide necessary information regarding a health insurance cost comparison despite Yazurlo's written request that he do so; provided an inaccurate cost comparison between competing carriers

5

(Tr. 537:11-538:23; 576:22-578:3); inaccurately represented that no state aid was available for a construction project (Tr. 567:24-570:8); unilaterally fired a secretary without proper authorization from Yazurlo (Tr. 573:12-575:4); contacted the District's legal counsel without Yazurlo's permission (Tr. 578:4-24); was responsible for a budget shortfall (Tr. 586:22-587); failed to deliver the monthly budget report by the December 6, 2001 deadline Yazurlo had set (Tr. 588:15-590:9); and telephoned the Board President without Yazurlo's knowledge or permission in order to complain about Yazurlo and his management of the District.  (Tr. 600:21-601:6)

Assistant Superintendent Barbarann Tantillo testified that she told Yazurlo – before Smith's termination – that Smith "did not have the skills and competency required to carry out the tasks for the director of finance."  (Tr. 879:2-5; see also Tr. 878:20-879:5).  According to Tantillo, Smith was unable to answer questions of Board members during meetings regarding monthly budget reports that he had prepared (Tr. 879:13-23), and was unfamiliar with basic terms such as "zero based budget."  (Tr. 876:2-877:14)

Joanna Niles, Smith's direct supervisor at the West Islip School District – his former employer – also testified at trial.  Niles testified that she had recommended that Smith "be terminated because he did not possess the necessary skills to continue in the capacity of assistant to the assistant superintendent."  (Tr. 374:10-17)  Niles' April 2001 evaluation of Smith stated that he had weaknesses in "bank reconciliations, journal entries, cashflow and cash balance projections," had demonstrated a "reluctance to ask for help from district personnel [and an] incomplete knowledge of Excel," and had had a "personality conflict with [a] subordinate."  (Tr. 378:15-22)  Niles further testified that

Smith had caused West Islip's bank account to be overdrawn.  (Tr. 378:23-379:12)

Smith was eventually asked to resign from his post at West Islip, a fact about which he

lied on his employment application to the Tuckahoe School District.  (Tr. 374:4-376:10;

456:2-6)

### E.      Smith's Termination

Yazurlo recommended to the Board that Smith be terminated on

December 7, 2001.  (Ex. PP, Tr. 599:20-23).  The Board voted to terminate Smith's

employment on January 7, 2002.  (Tr. 511:7-22)

Yazurlo testified that he felt "betrayed" after learning that Smith had

complained to the Board President, and that it was this incident – which took place on

December 6, 2001 – that provided the impetus for his December 7, 2001 recommendation

that Smith be terminated.  (Tr. 600:16-23, 601:12-14)  Yazurlo denied that his

termination recommendation was related in any way to Smith's race (Tr. 604:13-15) or to

Smith's allegation that Yazurlo had used a racial epithet – an allegation of which Yazurlo

was unaware as of January 7, 2002.  (Tr. 607:2-4)  Yazurlo further testified that his

termination recommendation was not related to Smith's alleged complaints regarding

Yazurlo's treatment of Justine Redding.  (Tr. 604:13-15)  Yazurlo said that as of January

7, 2002, he had not heard from Smith or anyone else that Redding had been offended by

their pre-Thanksgiving exchange.  (Tr. 604:16-605:2)

Tantillo testified that on December 7, 2001, Yazurlo told her that he would

be recommending Smith's termination because Smith did not have the ability to fulfill his

job responsibilities.  (Tr. 881:2-9)  Yazurlo also informed her of Smith's complaint to the

Board President about Yazurlo's management of the District.  According to Tantillo,

Smith's action violated District communication protocols, because any employee contact with a Board member required Yazurlo's permission.  (Tr. 881:15-882:6)

Tantillo called Smith and informed him of Yazurlo's decision.  During that conversation, Smith did not raise any allegations of race discrimination, did not mention Yazurlo's use of a racial epithet, and did not suggest that Yazurlo had treated Redding inappropriately.  (Tr. 883:9-884:6)  Tantillo further testified that prior to his termination on January 7, 2002, Smith had never complained about race discrimination, about Yazurlo's alleged use of a racial epithet, or about Yazurlo's alleged inappropriate behavior towards Redding.  (Tr. 884:7-18)

Dr. Douglas Reich – the Board President – testified that on December 6, 2001, he had a telephone conversation with Smith in which Smith complained that Yazurlo was a poor supervisor and was mismanaging the District.  (Tr. 812-13)  Smith never mentioned Yazurlo's "brown sugar" remark, however, nor did he make any claim of race discrimination or accuse Yazurlo of using a racial epithet.  (Tr. 813:4-16)

On January 7, 2002, the Board voted to terminate Smith's employment. Board member Frank Coleman, Board Vice President Buonocore and Board President Reich – who all took part in the vote – testified that as of January 7, 2002, they had never heard from Smith or from any other source that Smith was a victim of race discrimination, that Yazurlo had used a racial epithet, or that Yazurlo had engaged in inappropriate behavior with Redding.  (Tr. 492:6-18; 512:17-513:5; 815:12-816:3).

## DISCUSSION

Smith argues that "no reasonable jury could have held . . . that Plaintiff did not prove by a preponderance of evidence that race was not a motivating factor in his

8

termination or that he did not prove by a preponderance of the evidence that Defendant

acted in retaliation for his engaging in protected activity. . . ." (Pltf. Br. 8)  According to

Smith, "the record was replete with evidence which should have, by any stretch of the

imagination, resulted in an affirmative answer to both questions." (Id.)

 Given the trial record, this is a frivolous argument.  This case turned on

witness credibility and, in particular, on whether the termination of Smith was based on

his poor performance or on racial or retaliatory animus.  Smith's credibility was

undermined by a host of factors, including evidence (1) of his poor performance in

Tuckahoe; (2) that he had lied on his Tuckahoe employment application about the

circumstances of his departure from West Islip; and (3) that his performance in West Islip

– in connection with duties similar to those he was assigned in Tuckahoe – was seriously

deficient.  In sum, there was ample evidence – indeed overwhelming evidence – from

which a jury could conclude that Smith's termination was not due to racial animus or

retaliatory intent.

## I. LEGAL STANDARD

 The standard for granting judgment as a matter of law under Fed. R. Civ.

P. 50 is "well established":

> Judgment as a matter of law may not properly be granted
> under Rule 50 unless the evidence, viewed in the light most
> favorable to the opposing party, is insufficient to permit a
> reasonable juror to find in her favor.  In deciding such a
> motion, the court must give deference to all credibility
> determinations and reasonable inferences of the jury, and it
> may not itself weigh the credibility of witnesses or consider
> the weight of the evidence. Thus, judgment as a matter of
> law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting
> the verdict that the jury's findings could only have been the
> result of sheer surmise and conjecture, or

> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 288 (2d Cir. 1998); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008) (same).

In order for the Court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotations omitted). The Fed. R. Civ. P. 59(a) standard is "less stringent" than the standard under Fed. R. Civ. P. 50 "in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."[4] Id. at 244-45 (internal quotations omitted). In weighing the evidence, however, the Court "should not ordinarily ignore the jury's role in resolving factual disputes" and in assessing witness credibility. MacMaster v. City of Rochester, No. 05 Civ. 06509, 2009 WL 63045, at *6 (W.D.N.Y. Jan. 6, 2009).

---

[4] In some cases, the Second Circuit has stated that, in ruling on a Fed. R. Civ. P. 59 motion for a new trial, it would "view the record in the light most favorable to . . . the party against whom a new trial is sought." Kerman v. City of New York, 374 F.3d 93, 122 (2d Cir. 2004) (citing cases). The prevailing rule, however, is the standard set forth in Manley v. AmBase Corp., 337 F.3d 237 (2d Cir. 2003). See 11 Wright, Miller & Kane, Federal Practice & Procedure § 2806 (2d ed. 1995) (in deciding a Rule 59 motion, "[t]he judge is not required to take that view of the evidence most favorable to the verdict-winner").

## II. SMITH IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR TO A NEW TRIAL ON HIS RETALIATION CLAIM

> To prevail on a Title VII retaliation claim at trial, plaintiff must show:
>
> by a preponderance of the evidence that: (1) [the plaintiff] participated in a protected activity, (2) the defendant knew of the protected activity; (3) [the plaintiff] experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). The McDonnell Douglas burden shifting analysis applies to retaliation claims brought pursuant to Title VII. See Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003). Accordingly, if a plaintiff properly alleges a prima facie case of retaliation, and the employer proffers a legitimate, non-retaliatory reason for the challenged employment decision, the plaintiff must present evidence that would be sufficient to permit a rational jury to conclude that the employer's explanation is merely a pretext for impermissible retaliation. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)(citations omitted).[5]

Jackson v. New York City Transit, 348 Fed.App'x. 666, 667 (2d Cir. 2009) (unpublished opinion) (emphasis in original).

Smith argues that "[t]here was no question but that Plaintiff engaged in protected activity" because Smith testified he demanded that Yazurlo apologize on multiple occasions for the "brown sugar" comment. (Pltf. Br. 8) Smith's argument ignores that there was conflicting testimony as to whether Smith's account of the "brown sugar" remark was accurate, whether Smith was present for the "brown sugar" remark, and whether Smith ever asked Yazurlo to apologize or otherwise complained about the remark to anyone prior to the January 7, 2002 vote by the Board to terminate his employment. In short, it was disputed at trial whether Smith ever engaged in protected

---

[5] The jury was so instructed. (Tr. 1000:25-1007:18)

activity prior to the Board's January 7, 2002 vote terminating his employment, and it was

for the jury to decide which witness's testimony to believe as to this factual issue.  See,

e.g., Ormerod v. County of Niagara, No. 06 Civ. 724 (WMS), 2010 U.S. Dist. LEXIS

85213, at *4 (W.D.N.Y. Aug. 18, 2010) ("It is the jury's function to credit and resolve

competing accounts and judge the credibility of witnesses. . . . The fact that they did so in

Defendants' favor in this case does not entitle Plaintiff to judgment as a matter of law."

(citing Heller v. Champion Int'l Corp., 891 F.2d 432, 436 (2d Cir. 1989) (Noting that

"the jury was entitled to disregard [one witness's] testimony and believe other witnesses.

. . . Credibility issues of that nature are for the jury not the court to resolve.")).

   Smith similarly argues that "[t]here was no question of motivation with

respect to the retaliation claim," and that "[t]he evidence was striking as to how Dr.

Yazurlo's attitude toward Plaintiff changed after November 21, 2001, the date of the Dr.

Redding encounter."  (Pltf. Br. 10)  Smith once again ignores the fact that his account

was disputed at trial.  Yazurlo denied that Smith ever complained to him about the

"brown sugar" remark.

   Smith's conclusory assertions about his job performance are similarly

unavailing.  As discussed above, there was extensive evidence at trial concerning Smith's

poor job performance.  Smith disagreed with many of these criticisms at trial and argued

that they were pretextual.  The jury was free to credit as much or as little of this

testimony as it saw fit in reaching its verdict.  The jury was also free to credit Yazurlo's

testimony that he felt betrayed when Smith complained to the Board President about

Yazurlo's management of the District, and that this act provided the impetus for

Yazurlo's termination recommendation.

In sum, Smith's motion to set aside the verdict on his retaliation claim must be denied, because there was neither "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" nor "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [him]." See Galdieri-Ambrosini, 136 F.3d at 288.  Smith's motion for a new trial on his retaliation claim must likewise be denied, because the record does not establish that "the jury's verdict [w]as against the weight of the evidence." See Manley, 337 F.3d at 245.

## III.   SMITH IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR TO A NEW TRIAL ON HIS RACE DISCRIMINATION CLAIM

Smith also claims that his employment was terminated because of racial animus.

"Title VII cases[] can be characterized as 1) pretext cases and 2) mixed motive cases." Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997).  At summary judgment, this Court concluded that Smith's race discrimination claim should be analyzed under the "mixed motive" framework, see Smith, 2009 U.S. Dist. LEXIS, at *19, and the jury was instructed accordingly.  (Tr. 995:16-1000:24)  At the first stage of the mixed-motive analysis, plaintiff must show that "a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision. . . ." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 173 (2d Cir. 2006)(citations omitted).  At the second stage of the mixed motive analysis, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway." Raskin, 125 F.3d at 60.

13

Smith argues that – because of Yazurlo's alleged use of a racial epithet – the jury was required to find that race was at least one of the motivating factors behind his termination.  (Pltf. Br. 13)  Yazurlo and DiCarlo testified, however, that the racial epithet incident described by Smith never happened.  It was the jury's role to decide this issue.  In connection with deciding whether Yazurlo harbored racial animus, the jury was also free to consider (1) Smith's poor job performance, (2) the fact that Yazurlo had recommended Smith for the Director of Finance position only four months before recommending that his employment be terminated;[6] and (3) evidence concerning Yazurlo's treatment of other African Americans.

Because there was neither "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" nor "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [him]," Smith's motion to set aside the verdict on his race discrimination claim must be denied.  See Galdieri-Ambrosini, 136 F.3d at 288.  Smith's motion for a new trial as to his race discrimination claim must also be denied, because the record does not establish that "the jury's verdict [w]as against the weight of the evidence."  See Manley, 337 F.3d 237, 245.

-------------------------------------------------------

[6] Because only a short period of time elapsed between Smith's hiring and firing, and because Yazurlo played a significant role in both actions, the "same actor" inference applied.  See Grady v. Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire. . . . This is especially so when the firing has occurred only a short time after the hiring.").  The jury was so instructed. (Tr. 998:16-21)

## CONCLUSION

For the reasons stated above, Smith's motion to set aside the verdict and

for a new trial is DENIED.  The Clerk of the Court is directed to terminate Defendant's

motion (Docket No. 43) and to close this case.

Dated: New York, New York
       September 22, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge